**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KEVIN DOYLE,

     *Plaintiff*,

*v.*                  CASE NO. 2:13-CV-12916

CAROLYN W. COLVIN      DISTRICT JUDGE NANCY G. EDMUNDS
Commissioner of Social Security,   MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Commissioner's decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 11.)

Plaintiff Kevin Doyle was forty-four years old at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 37.) Plaintiff worked as a welder in various factories from January 1996 until February 2010. (Dr. at 111-16, 129.) On April 1, 2010, Plaintiff filed the present claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Tr. at 101.) Plaintiff then filed the other present claim for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381-1383f, on July 21, 2010. (Tr. at 105.) He alleged that he became unable to work on February 12, 2010. (Tr. at 101, 105.)

The claim was denied at the initial administrative stage. (Tr. at 44-45.) In denying Plaintiff's claims, the Commissioner considered disorder of the shoulder and affective disorder. (*Id.*) On December 19, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") John A. Ransom, who considered the application for benefits de novo. (Tr. at 28-42.) In a decision dated February 9, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 15, 23.) Plaintiff requested a review of this decision on February 19, 2012. (Tr. at 8-9.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on May 3, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On July 3, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

## B.    Standard of Review

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are

supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a

different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'"[A]n ALJ can consider all the evidence without directly addressing in his written

decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

## C.      Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. § 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

5

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.    ALJ Findings**

6

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through September 30, 2013, and had not engaged in substantial gainful activity since February 12, 2010, the alleged onset date. (Tr. at 17.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "left shoulder and foot pain, and adjustment and polysubstance addiction disorders." (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 17-18.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 21.) The ALJ also found that Plaintiff was forty-two years old on the alleged disability onset date, which put him in the "younger age" category. (Tr. at 22.) *See* 20 C.F.R. §§ 404.1563, 416.963. (*Id.*) At step five, the ALJ found that Plaintiff could perform a limited range of light work in jobs existing in significant numbers in the regional economy. (Tr. 18-21, 22-23.)

### E.    Administrative Record

Plaintiff saw Drs. Shantala Sonnad and Ronald Hunt[2] on October 5, 2009 regarding his depression.[3] (Tr. at 243.) He recounted a twenty-year history of depression fueled by twenty-five years of alcoholism and six years of drug abuse. (*Id.*) Rehab had failed in the past and he now sought another way to end his addictions. (*Id.*) The last time he consulted with a physician for depression was in the aftermath of his suicide attempt in 1989. (*Id.*) He denied any current suicidal ideation. (*Id.*) The physicians' physical examination was unremarkable and they ordered blood

---

[2] Dr. Hunt signed the session notes much later, in June 2010. (Tr. at 243.)

[3] Hugh Armbruster, a licensed social counselor, drafted an unaddressed letter on December 9, 2010, stating that he treated Plaintiff in 1997 and 2000 for depression and substance and alcohol abuse. (Tr. at 270.) No other records from Mr. Armbruster are in the Record.

work to obtain more information. (*Id.*) They assessed alcoholism, insomnia caused by alcoholism, substance abuse, depression, and anxiety. (*Id.*)

Plaintiff entered the Sacred Heart Rehabilitation Center on October 16, 2009 for detoxification. (Tr. at 172-73.) The physical examination at admission noted that he had full range of motion with his extremities. (*Id.*) He had proper orientation to his physical and social surroundings and could engage in abstract thinking, but his memory was "failing" and his mood was angry and depressed. (Tr. at 173.) He sought help for his substance abuse at Sacred Heart after his former employer called him back to work. (*Id.*) The physician gave a guarded prognosis, in part due to the failure of his three prior detoxification treatments at Sacred Heart. (*Id.*) He successfully completed treatment and left on October 18. (Tr. at 170.) The discharge paperwork showed that he was not suicidal, but his mental issues were severe. (Tr. at 171.)

On December 7, 2009, Plaintiff returned to Dr. Sonnad, who was accompanied on this appointment by Dr. Scott Plensdorf. (Tr. at 242, 378.) Plaintiff reported "left arm and shoulder pain [occurring] for the past six weeks after returning to his job." (*Id.*) His hands also tingled and went numb at times, which he took as signs of undiagnosed carpal tunnel syndrome ("CTS"). (*Id.*) He had left shoulder tenderness and only a limited range of motion on shoulder abduction. (*Id.*) The physicians diagnosed left rotator cuff irritations, possible CTS, and tobacco and alcohol abuse. (*Id.*) They prescribed Naprosyn, because the Motrin failed to ease the pain, and wanted him to return in two weeks. (Tr. at 241-42.)

In Dr. Plensdorf's session notes, he wrote that Plaintiff's lab results from the previous visit showed potential liver problems. (Tr. at 241, 379.) Plaintiff informed the physicians that he stopped drinking and began participating in Alcoholic's Anonymous meetings. (*Id.*) Dr. Plensdorf

considered Plaintiff's shoulder to be symmetrical and their range of motion "excellent." (*Id.*) He provided Plaintiff with rotator cuff exercises. (*Id.*)

Dr. Plensdorf signed notes from a visit sometime in January 2010 dealing with Plaintiff's upper respiratory system. (Tr. at 238-39.) The notes mention that Plaintiff continued to abstain from alcohol, which the physician confirmed through blood work showing his liver improving. (Tr. at 239.) Plaintiff's left shoulder pain also persisted. (*Id.*) Dr. Plensdorf estimated that Plaintiff could return to work on January 21, 2010. (*Id.*)

Plaintiff went to Concentra Medical Center on February 26, 2010, complaining that he injured his left shoulder on October 28, 2009. (Tr. at 209, 210.) He saw Mr. John Kuksa, a certified physician's assistant, and Dr. Michelle L. Ramirez, a physical therapist. (Tr. at 209-17.) He claimed the injury occurred by repeatedly lifting steel, although it did not manifest immediately. (Tr. at 209.) The treatment notes indicate he visited his physician twice since the injury and began taking Naprosyn to little effect. (Tr. at 210.) He described an aching, sore, and tender pain that limited his movement and produced stiffness, but did not radiate to other areas or cause paresthesias, bruising, or swelling. (*Id.*)

Mr. Kuksa's examination found tenderness and decreased range of motion on the trapezius and anterior portion of the shoulder, but no deformity. (*Id.*) He could abduct his shoulder, or raise his arm to the side, one-hundred and twenty degrees with pain. (*Id.*) He achieved a one-hundred and fifty degree shoulder flexion with pain. (*Id.*) He had no pain with internal or external rotations. (*Id.*) The preliminary x-ray reading was "probably negative," which the radiologist's report confirmed a few days later. (Tr. at 211, 222.) In his social and medical history report, Mr. Kuksa wrote that Plaintiff drank twelve beers per day and smoked thirty cigarettes per day. (Tr. at 210.)

9

He had smoked for twenty-five years. Mr. Kuksa diagnosed shoulder tenosynovitis and strain, describing the severity as "[m]oderate" and telling Plaintiff to take ibuprofen and begin physical therapy. (Tr. at 211.) Plaintiff was not to lift anything over five pounds. (*Id.*)

Dr. Ramirez consulted with Plaintiff on the same day. (Tr. at 212.) She performed some of the same tests as Mr. Kuksa, coming up with different numbers: his left should flexion was one-hundred degrees, extension was forty-five degrees (the same as his right), external rotation was forty-five degrees, internal rotation was thirty-five degrees, and abduction was ninety degrees. (Tr. at 212-13.) Dr. Ramirez likewise found tender spots on the shoulder. (*Id.*) His left shoulder was also weaker than his right in some measurements, although he maintained three- or four-out-of-five strength levels on a visual analog ("VA") scale on the few measurements his left shoulder lagged his right. (Tr. at 213.) She concluded that he had pain, a limited range of motion, and decreased muscle performance. (*Id.*) Her notes stated that the impairments "prevent the patient from performing [his] standard activities of daily living and work activities," but therapy would address the issues and "the patient demonstrates good prognosis for improvement." (*Id.*) She laid out goals that would see Plaintiff pain free, with restored muscle performance and range of motion. (Tr. at 214.)

Dr. Ramirez's examination of Plaintiff, on March 1, displayed a slight increase in left shoulder abduction, inching up from ninety to one-hundred degrees. (Tr. at 201.) His shoulder adduction strength also increased, but his internal rotation strength decreased. (*Id.*) Otherwise, the strength and flexibility test results remained the same. (*Id.*) His left shoulder tested positive on new, specialized measures: impingement, Hawkins-Kennedy, supraspinatus, and speed. (Tr. at 201-02.) She opined that Plaintiff was making either modest or moderate progress achieving his

various goals. (Tr. at 202.) She recommended iontophoresis treatment patches and continued exercises. (Tr. at 202-03.) Plaintiff returned to Dr. Ramirez the next day. (Tr. at 195.) The only changes were a slight decrease in external rotation strength and increase in adduction strength. (Tr. at 196.) Additionally, Dr. Ramirez now concluded that he had not continued progressing toward a few of his goals. (Tr. at 197.)

On his fourth visit to Dr. Ramirez, Plaintiff grumbled that while the iontophoresis patch provided temporary relief, his pain had not decreased since he started treatment seven days prior. (Tr. at 189.) Shoulder movement caused pain; however, over the past two days his flexion motion increased twenty percent, his external rotation range by eleven percent, and his internal rotation range nearly doubled. (*Id.*) Plaintiff agreed to try another session the following week.

That session, which apparently became his final visit with Dr. Ramirez and Mr. Kuksa, took place on March 5, 2010.[4] (Tr. at 178.) Dr. Ramirez's findings were unchanged, although it does not appear that she conducted strength or flexibility testing. (*Id.*) Plaintiff reiterated his complaints about the lack of progress to Mr. Kuksa. (Tr. at 185.) Though his shoulder abduction was one hundred twenty degrees on his first appointment with Mr. Kuksa just twelve days before, it was now a painful ninety degrees. (Tr. at 185, 210.) His shoulder flexion had decreased by half. (Tr. at 185, 210.) The medication list had grown to include tramadol and cyclobenzaprine. (Tr. at 185.) Mr. Kuksa repeated his restrictions from the first session, limiting Plaintiff from using his left shoulder to lift over five pounds, push or pull over ten pounds, or reach overhead. (Tr. at 186.)

---

[4] Plaintiff scheduled a reevaluation appointment with Mr. Kuksa for March 16, 2010, but no documents from the meeting are in the Record. (Tr. at 186.)

The records from Concentra also include three functional capacity reports completed over a two-week period from February 26 to March 9. (Tr. at 183, 193, 206.) The sheets include a line for "Treating Physician," although it is unclear whether this physician completed the form or whether it is simply the name of Plaintiff's physician. (*Id.*) Each sheet states Plaintiff could not use his left arm to lift more than five pounds, push or pull over ten pounds, or reach above shoulder-level. (*Id.*) These restrictions also appear on the paperwork for each visit, stating the limitations and consistently noting that Plaintiff could return to work on the day the of the appointment. (Tr. at 177, 179, 180, 187, 199, 204, 218.)

On March 30, Plaintiff saw Drs. Sonnad and Hossam Hafez. (Tr. at 235, 376-77.) His left shoulder remained tender and had decreased strength and range of motion. (*Id.*) They prescribed Tylenol for his pain, Paxil for his depression, and a sling to wear during physical activity. (*Id.*) Roughly three weeks later, on April 23, Drs. Sonnad and John Chahbazi examined Plaintiff. (Tr. at 234, 375.) He had not taken the Paxil because he felt "very good. . . . ha[d] been going to AA meetings and [Narcotics Anonymous] meetings . . . . [and was] sleeping well and happy and [did] not feel depressed." (*Id.*) Consequently, he did not feel he required the anti-depressant and, in any case, was hesitant to take more prescription drugs in light of his history. (*Id.*) Plaintiff intended to continue attending addiction meetings and continue making progress with his depression; he also intended to see an orthopedic specialist. (*Id.*)

Plaintiff consulted with various staff at the McLaren Community Medical Center during June and July. (Tr. at 253.) On June 14, a physician prescribed him Flexeril, a form of cyclobenzaprine, and extra strength Vicodin. (Tr. at 256.) An MRI of his shoulder, ordered by Dr. Alex Rodriguez, showed that the bone tissue was "well mineralized and intact" and there were no

abnormalities. (Tr. at 261.) To the extent they are legible, the rest of the notes establish his continuing struggles but add no new information. (Tr. at 253-58.) Plaintiff also requested a referral to a orthopedic specialist. (Tr. at 381-82.)

Plaintiff obtained MRI results on July 6, 2010. (Tr. at 337, 339.) The radiologist explained that a multiloculated cystic structure arose "from the posteroinferior aspect of the glenoid labrum," with "fluid extending through the inferior labrum." (Tr. at 337.) The structure had two components, one next to the "quadrilateral space and the other located medial to the axillary recess." (*Id.*) Plaintiff had a posteroinferior labral tear "associated" with the cyst; findings of quadrilateral space syndrome resulting in "teres minor depervation edema and mild muscle atrophy"; a rim rent tear involving the supraspinatus tendon; "[s]upraspinatus tendinosis"; and significant "degenerative changes of the acromioclavicular joint predisposing to impingement. (Dr. at 339.)

On August 24, 2010, Plaintiff finally visited an orthopedic specialist, Dr. Charles Safley. (Tr. at 267.) Dr. Safley recorded that Plaintiff was right-handed and that his "systems [were] generally benign . . . ." (*Id.*) His pain in his left shoulder sometimes radiated into his right trapezius. (*Id.*) The pain disrupted his sleep and impeded his household work. (*Id.*) His abduction was approximately sixty degrees. (*Id.*) Dr. Safley observed that the muscle in his hands and forearms was not atrophying and those areas did not appear numb. (*Id.*) He had weakness on a few examinations and stiffness in abduction, but Dr. Safley could move the shoulder to one-hundred and ten degrees before pain prevented further movement. (Tr. at 267-68.) X-rays displayed no degenerative or traumatic changes and only mild acromioclavicular joint narrowing. (Tr. at 268.) The MRI showed acromioclavicular joint degenerative change, rotator cuff tendinosis changes, and

the paralabral synovial cyst, but no muscle atrophy. (*Id.*) Dr. Safley would not "recommend any intervention until his [workers' compensation] lawsuit [was] resolved." (*Id.*)

Dr. Rodriguez examined Plaintiff's feet on September 20, 2010. (Tr. at 355.) Plaintiff complained of pain in both heels, occurring sporadically over the past two years. (*Id.*) Dr. Rodriguez diagnosed plantar fasciitis, prescribed Motrin, and referred him to a podiatrist. (Tr. at 356.) Plaintiff returned on October 19, 2010, for a medication refill and also for a consultation about his shoulder pain, which he rated at a level six on a VA scale. (Tr. at 353.) Dr. Rodriguez refilled the Flexeril and extra strength Vicodin prescriptions. (Tr. at 354.) Plaintiff called on November 30 seeking a referral to a chronic pain clinic, and again on December 7 for a podiatrist referral. (Tr. at 352.) Plaintiff saw Dr. Rodriguez again on February 24, 2011, emphasizing his depression and anxiety. (Tr. at 344-45.) He received a prescription for Zoloft, an anti-depressant. (Tr. at 345.)

Plaintiff arranged an independent examination with Dr. Clifford M. Buchman for January 20, 2011. (Tr. at 390.) Dr. Buchman described his conclusions in a letter to Plaintiff's lawyer. (Tr. at 390-95.) He noted that Plaintiff stopped seeing Dr. Safley because Plaintiff lacked insurance. (Tr. at 391.) Plaintiff's shoulder constantly ached, he could lift only half a gallon of milk, and could not put his arm behind him, push with his arm, or pull. (*Id.*) He reported that he did not drive because he lost his license. (*Id.*) He smoked one and a half packs of cigarettes per day and stayed clear of alcohol. (Tr. at 392.) His left arm abducted to ninety degrees and had limited internal rotation. (Tr. at 393.) The left shoulder had a positive impingement test and also showed labral and acromialclavicular pathologies. (*Id.*) Dr. Buchman assessed a labral and rotator cuff tear, degenerative acromioclavicular joint with impingement, and adhesive capsulitis. (*Id.*) Plaintiff's

prognosis was fair to guarded and future treatment would require surgery; until then, Plaintiff could lift only five pounds. (Tr. at 394.)

Dr. Karen Marshall, a licensed psychologist, conducted a consultative mental health examination on February 11, 2011. (Tr. at 272.) Plaintiff gave a detailed medical history, beginning with mental health treatment he received at age ten. (Tr. at 272.) He came away from his most recent detoxification, in 2009, depressed. (*Id.*) Pain and anxiety disrupted his sleep and caused weight gain. (*Id.*) He last worked one year prior and could not return until his restriction on lifting and shoulder use were lifted. (*Id.*) Yet, he was not treating depression with medication or counseling. (*Id.*) He also reported health problems, including possible bone spurs in his feet, carpal tunnel syndrome, and knee pain. (*Id.*)

He then described his daily activities and social life. (Tr. at 273.) He moved in with his parents after living with a girlfriend for almost six months. (*Id.*) He rarely spoke with his sibling, had only one friend, and was a loner when he was working. (*Id.*) He could vacuum with his right hand, do laundry, shop for groceries, cook simple meals, and attend to his personal care. (*Id.*) During the day, he watched television, used the computer, and occasionally ran errands with his parents. (*Id.*)

Dr. Marshall wrote that he had organized mental activity and seemed to gauge his problems accurately, with "fair insight." (*Id.*) The depression manifested in "feelings of worthlessness a couple days out of the week," but he was not suicidal. (*Id.*) Some of the issues stemmed from his financial situation and pending litigation. (*Id.*) She found that he cooperated well, easily established a rapport, and had a normal mood and orientation. (*Id.*) Dr. Marshall concluded that his symptoms did not appear to impair his ability to complete tasks or appropriately relate to others

and his depression was mild. (Tr. at 274.) She diagnosed adjustment disorder, stated his polysubstance dependancy was in a "sustained, full remission," and gave a Global Assessment of Functioning score of 61.[5] (Tr. at 275.)

On March 8, 2011, Dr. William Nordbrock provided a psychiatric review technique form assessing Plaintiff from the alleged onset date. (Tr. at 278.) It appears that Dr. Nordbrock based his conclusions on  medical reports compiled at the time without conducting an additional examination. (Tr. at 288.) He particularly relied on Dr. Marshall's notes to conclude that Plaintiff's impairment was not severe, and that he had mild social difficulties, restrictions in daily living, and concentrating. (Tr. at 278, 286, 288.) He concluded that he had no episodes of decompensation. (Tr. at 286.)

Dr. Asit K. Ray conducted a physical consultative examination on March 14, 2011. (Tr. at 290-93.) Plaintiff claimed knee, foot, and left shoulder pain. (Tr. at 293.) His knee problem, he asserted, caused him to leave the military with an honorable discharge in 1985. (Tr. at 290.) He had not received any treatment for it or used any braces, and he had not received treatment for his foot. (*Id.*) He still smoked one pack of cigarettes per day; but he stayed sober. (*Id.*) During the examination, Dr. Ray observed that he walked normally, could walk on his toes and heals, squatted "fully with deep knee and hip bending" and stood up independently, had normal range of motion with spine, and his feet were normal. (Tr. at 291-92.) Plaintiff's left shoulder abduction was one-hundred and ten degrees, compared to one-hundred and sixty with his right. (Tr. at 291.) Both

---

[5] A GAF of 61 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

shoulders had normal internal and external rotation; neither experienced muscle atrophy. (*Id.*) He could close his fingers into a fist and his pinch grip remained intact. (*Id.*) His hand muscles had not atrophied, but there was "evidence of Duputryns contracture in both palms." (*Id.*) His knees appeared normal and Dr. Ray suggested that the lack of full flexion could result from the size of his thigh and calf. (Tr. at 292.)

Dr. Ray also examined the July 2010 MRI, observing the "rim rent tear" through the supraspinatus tendon, supraspinatus tendinosis, and marked degenerative changes in the acromioclavicular joint. (*Id.*) "My clinical impression," Dr. Ray concluded, "is that Kevin Doyle would be able to perform his usual and customary activities including his occupational duties without any restrictions." (Tr. at 293.)

On the same day as the consultative examination, results returned from an MRI of Plaintiff's hands and knees ordered by Dr. Rodriguez. (Tr. at 299-300.)The radiologist report displayed "mild narrowing of the first, second, third and fifth metacarpophalangeal joints of the right hand," "small erosion along the radial margin of the base of the proximal phalanx of the right third finger," "mild narrowing of the medial compartment of each knee," bipartate left patella, and "small osseous density within the soft tissues distal to the right femur." (Tr. at 300.)

The next month, on April 5, a medical consultant reviewed Plaintiff's files and developed a RFC report. (Tr. at 305-12.) Plaintiff could occasionally lift twenty pounds; frequently lift ten pounds; stand or walk for six hours during the workday; sit for six hours in the workday; could do limited pushing and pulling with the upper extremities; frequently climb ramps and stairs, balance, and stoop; never climb ladders, ropes, or scaffolds; occasionally kneel, crouch, and crawl. (Tr. at

306-07.) He had limited ability to reach, but no restrictions on handling, fingering, or feeling. (Tr. at 308.)

Plaintiff continued treatments at McLaren Medical Management from April, 2011 until the end of November, 2011. (Tr. at 396-405.) The reports add little to the Record other than demonstrating Plaintiff's continuing pain and consequent need for medication. (*Id.*) His pain level remained at six on a VA scale through November 22. (Tr. at 396.) He frequently requested refills for different reasons, once because he would be out of town when his current fill ran out, (Tr. at 399), and another time because his medication was stolen. (Tr. at 400, 402-03.)[6]

The administrative hearing began with Plaintiff answering questions from his counsel. (Tr. at 31.) The heaviest weight he lifted as a welder was one hundred pounds, and his shoulder pain prevented him from returning to anything approaching that exertional level. (Tr. at 31-32.) Physical therapy ended, Plaintiff testified, when "[t]hey told me I couldn't do it no more." (Tr. at 32.) He lacked funds to pay for additional sessions or surgery. (*Id.*) He listed his medications and added that they caused fatigue and depression. (Tr. at 33.) His pain level, which he had rated as a six just a few weeks before, was now constantly at eight or nine on a VA scale. (*Id.*) Personal care

---

[6] The file also contains reports completed after the ALJ's decision. (Tr. at 406-60.) Many of the records are pre-printed form reports from physician appointments, (Tr. at 415-37), and others show x-ray and MRI results, (Tr. at 438-42, 450-54). The remaining notes come from an orthopedist, Dr. Sidney N. Martin. (Tr. at 408-09, 411-12, 444-45, 455-59.) She reported that the cyst in his glenoid was not as large as it first appeared and "no longer seems to go into the quadrilateral space." (Tr. at 408.) Despite neurologic symptoms, his EMG "was stone cold normal." (*Id.*) She felt that surgery might not relieve the pain due to the cyst's unusual placement. (*Id.*) In any case, these records are not properly before the Court because the ALJ never reviewed them. In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

presented many difficulties, but he could "get through it" by using his right hand. (Tr. at 33-34.) Asked if he helped with household chores, he responded, "I absolutely do nothing. It hurts too much." (Tr. at 34.) The ALJ then interjected, questioning if Plaintiff could "do any of those things with the right arm," which Plaintiff admitted he could. (*Id.*)

He told his representative that he could sit for a few hours at a time and, because his "feet kind of hurt," he could stand for up to an hour and a half. (Tr. at 35.) Pain shot through his feet if he quickly went from standing to sitting, then got "back up right away." (Tr. at 35-36.) He nonetheless could walk "quite a ways . . . ." (Tr. at 36.) He reported a five pound lifting limit for his left arm. (*Id.*)

Plaintiff then told the ALJ, who took over the questioning, that depression, shoulder pain, and foot pain were his only "problems," and that his past carpal tunnel syndrome did not currently bother him. (Tr. at 38.) He spent his days in a chair watching television, occasionally walking one block outside, but no longer fishing, exercising, or playing sports. (Tr. at 38-39.)

The ALJ then posed a hypothetical to the VE, asking her to consider an individual with Plaintiff's background who

> could perform light work but he'd require a job where he'd only have to lift up to five pounds with his left upper extremity. No repetitive pushing or pulling over 10 pounds or reaching or torquing with his left upper extremity. The 10 pounds is with the left upper extremity. . . .
>
> No air or vibrating tools, limited contact with the public, no prolonged walking or standing, and no above shoulder work with his left upper extremity.

(Tr. at 39-40.) The VE responded that the individual could work as a security guard; a light work occupation that the VE testified existed in significant numbers in the regional economy. (3,000 positions in Michigan). In the sedentary category, he could work as a credit clerk (300 in

19

Michigan), charge account clerk (800 in Michigan), and surveillance system monitor (400 in Michigan). The VE added that a person off task twenty percent of the workday, or absent more than once per month, could not sustain employment. (Tr. at 41.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he had the residual functional capacity ("RFC") to perform a limited range of light work:

> The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with restrictions of no repetitive pushing or pulling over 10 pounds, lifting a maximum of five pounds with the left upper extremity, no air or vibrating tools, limited contact with the public, no prolonged walking or standing, and no above shoulder work with the left upper extremity.

(Tr. at 18.) Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff criticizes the ALJ's hypothetical for inaccurately describing his impairments. (Doc. 9 at 6.) He cites medical reports to show that the ALJ erred in finding his testimony was not credible. (*Id.* at 11-12.) He also argues that the hypothetical the ALJ used was inaccurate because it failed to include his likely off-task time and absenteeism. (*Id.* at 12.) Plaintiff ends with an extensive discussion of the treating source rule, but provides scarce application of the rule to the facts of this case.(*Id.* at 12-14.)

I suggest that the substantial evidence supports the ALJ's findings and recommend denying Plaintiff's Motion and granting Defendant's Motion.

### a.  Medical Sources, Plaintiff's Credibility, and the RFC

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable

21

medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §

404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[7] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to

---

[7] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight he assigns the treating source's opinion in his written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility

assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(I)   [D]aily activities;

 (ii) The location, duration, frequency, and intensity of . . . pain;

 (iii) Precipitating and aggravating factors;

 (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

 (v) Treatment, other than medication, . . . received for relief of . . . pain;

 (vi) Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing the RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require."

42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [the] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis. *Jones*, 336 F.3d at 474. In the first four steps, the claimant must prove her RFC. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to the RFC, 20 C.F.R. §§ 404.1560(c), 416.960(c), and consequently the burden remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

### b.   Analysis

Plaintiff attacks the ALJ's findings for distorting his limitations in the RFC. The precise targets of this criticism, however, are difficult to discern. Plaintiff opens with a protracted description of the rules surrounding the credibility analysis and also the requirement that the ALJ's hypothetical accurately describe the claimant. (Doc. 9 at 6-9.) He then shifts to recount his testimony and medical records in an attempt to prove the ALJ's findings diverged from the evidence. (*Id.* at 10-11.)

But quoting his own testimony of subjective pain and the many polysyllabic medical labels the physicians gave his conditions merely proves that his pain arose from diagnosable maladies. (*Id.*) Claimants must do more: they must show that the medical condition impairs them from

27

participating in substantial gainful activity. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."). Aside from a few restrictions given after a single examination, Plaintiff fails to translate the subjective complaints and medical jargon into impairments. The ALJ's decision adequately counters the argument by noting that Plaintiff's physical therapists gave similar limitations but still concluded he could return to work. (Tr. at 19, 177, 179, 180, 187, 199, 204, 218.)

The ALJ's discussion shows that he sufficiently "consider[ed]" the evidence. 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). First, the ALJ stated that he reviewed the Record under the relevant regulations: 20 C.F.R. §§ 404.1520, 404.1527, 416.927, 416.929. (Tr. at 19.) In similar contexts, the Sixth Circuit has found such statements to approach the minimum needed to satisfy the regulatory requirements. *White v. Comm'r of Soc. Sec.* 572 F.3d 272, 287 (6th Cir. 2009) ("[T]he ALJ expressly stated that she had considered S.S.R. 97-7p, which details the factors to address in assessing credibility. There is no indication that the ALJ failed to do so."). In any case, the ALJ went on to describe substantial sections of the medical evidence, highlighting information related to the factors in 20 C.F.R. §§ 404.1527(c), 416.927(c). (Tr. at 19-21.)

He first discussed the medical reports from Concentra that set limits on lifting, mentioned Plaintiff's physical therapy, noted diagnoses and treatments from Dr. Sonnad and Chahbazi, and described the MRI findings from July 6, 2010. (Tr. at 19-20.) Dr. Ray's findings were addressed, as were the 2011 x-rays showing mild narrowing of the joints in his right hand and the medial compartment of his knees. (Tr. at 20.) The medications appeared effective, although the ALJ

inaccurately states that claimant "did not testify they were ineffective."[8] (Tr. at 20.) Nonetheless, he is correct that there were no serious concerns with their usefulness. (Tr. at 20.) The ALJ further observed that no medical source suggested Plaintiff was incapable of working. (Tr. at 21.) In fact, "he was released to return to work" as early as March, 2010, with restrictions.[9] (*Id.*) Dr. Ray offered no limitations on his work, despite his rigorous work as a welder. (*Id.*)

The ALJ also looked at the mental health evidence, noting the lack of repeated episodes of decompensation. (Tr. at 18.) Plaintiff began feeling better in April 2010, telling Drs. Sonnad and Chahbazi that attending addiction meetings helped and, at that time, he was not even taking antidepressants. (Tr. at 19.) Moreover, Dr. Marshall's psychological examination found him in full and sustained remission, with only mild depression. (Tr. at 20.) The ALJ also acknowledged he was taking Zoloft at the time of the hearing. (*Id.*) The medication was his only treatment for mental issues. (Tr. at 272.)

Thus, the evidence in the Record was straightforward and the ALJ did not need to untangle contradictory opinions or scrutinize assertions that Plaintiff was disabled. His decision canvassed the relevant evidence and considered the required factors: he investigated the supportability of the opinions on the Record by looking at the objective evidence, such as the MRIs and x-rays, and he pointed out the consistency among the evidence by noting that no one offered significant restrictions aside from five pound lifting limits and no overhead work. Additionally, Plaintiff's treatment by medication and other modest methods is inconsistent with a finding of disability. *See*

---

[8] Plaintiff noted the growing ineffectiveness of his muscle relaxants. (Tr. at 35.)

[9] The ALJ incorrectly designated as a treating physician the physical therapist who actually provided this opinion. (Tr. at 21.)

*Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007). The ALJ touched on this point, noting that Plaintiff did not establish he needed surgery.[10]

The ALJ's credibility analysis also properly addressed the factors in 20 C.F.R. §§ 404.1527(c), 416.927(c). As shown above, he considered the treatments, medications, and other measures used for pain relief. He also noted the higher of the pain level estimates Plaintiff provided, an eight or nine on the VA scale, though the Record included lower levels Plaintiff gave to a physician around the same time. (Tr. at 19, 33, 353, 396.) He considered Plaintiff's testimony and his daily activities, which the impairments did not significantly restrict. (Tr. at 18.) Plaintiff could handle his finances and personal care, use the computer, engage others, cook, shop and drive had he not lost his license. (Tr. at 143-47.) Indeed, only his left arm had any substantiated problems; his other arm was unimpaired and, while he complained about his feet, knees, and hands, the Record displays only slight difficulties based on slim objective evidence. (Tr. at 33-34, 36, 272-73, 291-92, 299-300, 308.) In his application paperwork and at the hearing, Plaintiff indicated he could sit for extended periods. (Tr. at 35-36, 147.) He also testified that he could walk "quite a ways" and his feet only hurt if he sat down and then quickly stood. (Tr. at 36.) His ability to stand remained relatively intact–he could stand for up to ninety-minutes at a time. (Tr. at 20-21.)

---

[10] Whether Plaintiff needed surgery is disputable. The ALJ stated, "[t]he record has not established claimant has been advised additional left shoulder surgery was necessary and no foot, or any other surgery, has been recommended." (Tr. at 21.) Dr. Buchanan felt that Plaintiff required surgery, though he recommended relatively modest work restrictions–a five pound limit on lifting with Plaintiff's left arm–and he only examined Plaintiff once, at Plaintiff's request. (Tr. at 394.) Finally, Dr. Martin, in post-decision records, suggested that surgery might be counter-productive or simply unhelpful; but her rationale does not indicate that Plaintiff's injury required only conservative treatment. (Tr. at 408.)

Though the ALJ questioned the basis for many of Plaintiff's complaints, he nonetheless incorporated them into his RFC. The strictest restrictions any source laid out were the five-pound lifting limit, the ten pound push and pull limit, and the prohibition on overhead work (Tr. at 177, 179, 180, 183, 187, 193, 199, 204, 206, 211, 218, 394.) These all found a place in the RFC and the hypothetical posed to the VE. (Tr. at 18, 68.) The ALJ also credited Plaintiff's podiatric complaints and ruled out jobs requiring prolonged walking and standing. (Tr. at 18.) Finally, the ALJ accounted for Plaintiff's mental health issues by limiting contact with the public. (*Id.*) The ALJ could hardly do more to conform the RFC to the evidence.

Plaintiff suggests adding two more limits to the RFC that he believes would have tipped the scales in his favor: a twenty percent off-task rate and high absenteeism rate. (Doc. 9 at 12.) The VE stated that either of these conditions precluded work. (Tr. at 41.) Plaintiff does not explain how he arrived at these numbers or link these limits to any relevant evidence. Nothing in the Record suggested he had substantial problems concentrating or following instructions. Rather, Plaintiff indicated in his application that he worked "ok" with authority figures, handled stress and changes in his routine "ok," followed written and oral instructions "ok," and did not have problems with memory, task completion, concentration, understanding, or interpersonal skills. (Tr. at 147-48.)

To the extent Plaintiff relies on the treating source rule to support any of his arguments, he has waived the argument. Case law supports finding waiver where the claimant does not identify a treating source or treating opinion the ALJ improperly evaluated. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived."); *Aarti Hospitality*, *L.L.C. v. City of Grove City, Ohio*, 350 F.

31

App'x 1, 11 (6th Cir. 2009) ("After setting forth the applicable law on their due process claim, plaintiffs devote one sentence in their appellate brief to 'arguing' why the district court's judgment should be reversed . . . . Accordingly, we deem plaintiffs' appeal of their due process claim forfeited."); *Fielder v. Comm'r of Soc. Sec.*, No. 13-10325, 2014 WL 1207865, at *2 (E.D. Mich. Mar. 24, 2014) (holding that claim on appeal from ALJ's decision was waived because plaintiff referred to it in a perfunctory manner); *Preston v. Comm'r of Soc. Sec.*, No. 12-13327, 2013 WL 4550512, at *7 (E.D. Mich. Aug. 28, 2013) (finding waiver where "Plaintiff failed to identify a specific medical opinion the ALJ erred in evaluation") (adopting report and recommendation); *Perry ex rel. King v. Comm'r Soc. Sec.*, No. 12-cv-14439, 2013 WL 3328523, at *7 (E.D. Mich. July 2, 2013) ("Plaintiff cites to case law that ALJs must provide good reasons for discounting the opinions of the claimant's treating physicians, but she has not identified any treating physician opinion that she believes the ALJ overlooked or improperly weighed.") (adopting report and recommendation). Plaintiff here fails to list any physician who merits treating source status, even though a few might, and he does not hint at which treating source opinions the ALJ bungled. (Doc. 9 at 7-14.) His discussion of the law is solid–even extensive–but the Court lacks any indication of where the argument was headed. The only restrictions in the Record come from Dr. Buchanan after a single consultative examination; the sources at Concerta–a physical therapist and a physician assistant–are not "acceptable medical sources," let alone treating sources. The ALJ's findings, therefore, do not contradict any potential treating source restriction in the Record.

Because substantial evidence supports the ALJ's findings, and he considered Plaintiff's abilities in constructing his hypothetical and RFC, I accordingly recommend that Plaintiff's Motion be denied.

###    3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise

33

response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 28, 2014                              /S PATRICIA T. MORRIS
                                                 Patricia T. Morris
                                                 United States Magistrate Judge